[No. A131495. First Dist., Div. Four. Nov. 15, 2011.]

Conservatorship of the Person and Estate of BOBBY JACK CORNELIUS.
BOBBIE MCDONALD, Petitioner and Respondent, v.
BOBBY JACK CORNELIUS, Objector and Appellant.

COUNSEL

Philip A. Gunning for Objector and Appellant.

Janice Sternfeld; and Alice L. Perlman for Petitioner and Respondent.

OPINION

**SEPULVEDA, J.**—A daughter petitioned for temporary and permanent conservatorship of her elderly father upon allegations that he was not receiving adequate nutrition, hygiene, and medication, individuals living with the father were financially abusing him, and those individuals were conducting illegal activity on the premises. An investigator appointed by the court substantiated the allegations and the court established a temporary conservatorship that lasted six months. A court-appointed attorney reported that the temporary conservatorship improved the conservatee's situation but the father strenuously objected to the conservatorship. The daughter dismissed her petition for a permanent conservatorship. The court awarded compensation and reimbursement of expenses to the temporary conservator and her attorneys, to be paid from the conservatee's estate. The conservatee appeals the award.

The conservatee claims that Probate Code sections 2641 and 2642 authorizing payments to a conservator and the conservator's attorneys do not apply where there was only a temporary conservatorship, never a permanent conservatorship. The conservatee also claims that, even if a temporary conservator may recover costs and legal fees, the amount awarded here was excessive and thus an abuse of the court's discretion. We reject the claims and affirm the order.

## I. FACTS

Bobby Jack Cornelius is a 73-year-old widower. On July 7, 2010, his daughter Bobbie McDonald filed petitions for temporary and permanent conservatorship of the person over her father. (Prob. Code, §§ 1820, 2250.) The petitions were supported by declarations from several family members attesting to Cornelius's compromised physical and mental state and susceptibility to fraud being perpetrated by people who moved into his house and were operating a marijuana farm on the premises. The petition was also supported by a capacity declaration prepared by Cornelius's treating physician, who stated concerns about Cornelius's judgment and said that Cornelius's "competency needs to be evaluated in more detail."

As in all cases where a temporary conservatorship is sought, a court investigator was appointed to evaluate whether a temporary conservatorship was appropriate. (Prob. Code, § 2250.6.) The investigator, Kelly Jensen, conducted interviews on July 12 and 13, 2010, of Cornelius, Cornelius's attorney, and McDonald, and she also reviewed sheriff's reports and the physician's capacity declaration. The investigator reported to the court in advance of the July 14, 2010 temporary conservatorship hearing and later prepared a report with her findings. The investigator concluded that Cornelius "is urgently in need of medical and medication supervision and proper nutrition, and is at high risk of undue influence from what appear to be virtual strangers that he has allowed to live in his home." The investigator recommended a temporary conservatorship of Cornelius with McDonald as conservator.

On July 14, 2010, the court held a hearing attended by Cornelius's attorney, Tate Birnie, who objected to the conservatorship. The court found that a temporary conservatorship was in Cornelius's "best interest." The court ordered a temporary conservatorship through August 12, 2010, the day after a permanent conservatorship hearing was set to be heard. McDonald, Cornelius's daughter, was appointed the temporary conservator. The court investigator filed a subsequent report noting that Cornelius has memory deficits and impaired judgment, and requires assistance with money management, medical care, and daily living activities.

On August 5, 2010, Cornelius filed an objection to the appointment of a conservator and a declaration stating his disagreement with his family members' declarations. At the permanent conservatorship hearing first called on August 11, 2010, Cornelius's attorney, Tate Birnie, said Cornelius was in the hospital and wanted to substitute new counsel. The permanent conservatorship hearing was continued to October 13, 2010, and the temporary conservatorship extended to the day following the permanent conservatorship hearing.

On August 18, 2010, the court granted the request of Cornelius's attorney to be relieved as counsel and, when no other attorney substituted as counsel, the court accepted the recommendation of the court investigator and appointed Attorney Roberta Simi to represent Cornelius. (Prob. Code, § 1471, subd. (b).) On September 13, 2010, Cornelius gave notice that he had retained Philip Gunning to represent him as legal counsel (representation that continues through this appeal) but that court-appointed counsel, Simi, "is not being replaced hereby and may continue in her Court appointed role until discharged by the Court." On that same date, Cornelius filed supplemental objections to conservatorship of his person. Cornelius also demanded a jury trial.

On September 29, 2010, McDonald filed a petition for temporary conservatorship of Cornelius's person *and estate*, which was an expansion of her prior request limited to a conservatorship of the person. McDonald declared that the change was necessary because Cornelius was taking action to rescind McDonald's appointment as trustee of a trust he established and to assume financial control himself despite impaired capacity to make rational financial decisions. McDonald asked that a professional fiduciary, rather than herself, be appointed as temporary conservator. McDonald also moved to disqualify Attorney Gunning from representing her father as private counsel, asserting that her father lacked capacity to retain counsel and that the retention may have been the product of undue influence.

On that same date, court-appointed Attorney Simi filed an extensive report with the court. As the court directed, the report included background facts, factual and legal analysis, and recommendations "to assist the court in making a determination as to the course of action that would best serve the interests of the proposed conservatee." In preparing the report, Attorney Simi conducted over two dozen interviews, including interviews of Cornelius, his family members, attorneys, physicians, and neighbors. The attorney confirmed that Cornelius associated with people who lived in his house rent free, "obtained money and credit cards from him," and operated a marijuana farm. Attorney Simi reported that "[t]he Sheriff was called out to the property for incidents involving several of these friends on at least 12 occasions in the last year, including eradication of more than 100 marijuana plants in July . . . 2010."

Attorney Simi dismissed Cornelius's claim that the events giving rise to the conservatorship were isolated and that a conservatorship was no longer necessary. Attorney Simi cited medical reports showing that Cornelius has "significant impairment of many skills and [mental] functions." Cornelius's condition had improved since establishment of the conservatorship, Attorney Simi noted, but "[i]mprovements to Mr. Cornelius's situation have been made

largely as a result of arrangements made by the temporary conservator for help with taking medications; monitoring his health; ridding his home of various people who were abusing him physically, mentally, and financially; and having a group of responsible individuals who make their presence known with many of his friends and associates." Attorney Simi concluded that Cornelius was "unable to manage his own financial resources or resist fraud or undue influence, and a conservatorship of the estate would be appropriate and necessary," and recommended appointment of a professional fiduciary as conservator of his person and estate. The attorney noted: "Many of my recommendations are contrary to many of Mr. Cornelius's stated wishes to me, but the majority of Mr. Cornelius's objections and the course of action he suggests are inappropriate."

On September 30, 2010, the court appointed Deborah Wagner, a professional fiduciary, as temporary conservator of the person and estate of Cornelius. Wagner had been assisting McDonald in managing the conservatorship. Following a hearing on October 13, 2010, the court replaced Wagner with Shelley Ocana, another professional fiduciary, as conservator of the estate. The court terminated the temporary conservatorship of the person upon finding that Cornelius, although suffering mental deficits, was able to provide for his own personal needs, at least until a trial was convened on the petition for a permanent conservatorship of his estate and person. The court denied the motion to disqualify Attorney Gunning from representing Cornelius and, given the presence of private counsel, discharged court-appointed Attorney Simi.

Trial was set for December 2010, and later continued to January 2011. The temporary conservatorship of the estate was extended to January 10, 2011. On December 3, 2010, for reasons that do not appear in the record, McDonald dismissed her petition for conservatorship.

The proceedings then turned to the issue of compensation and reimbursement of expenses to the temporary conservator, attorneys, and providers. McDonald filed a petition detailing the costs. (Prob. Code, §§ 2641, 2642.) On February 8, 2011, the court issued an order awarding attorney fees and costs of roughly $34,000, as follows: (1) $22,350 to Perlman & Sternfeld LLP, the law firm that represented temporary conservator McDonald from June 28, 2010, through October 18, 2010, in the conservatorship proceedings; (2) $4,726.40 to Attorney Margaret Flynn of Tarkington, O'Neill, Barrack & Chong, who represented McDonald in seeking a restraining order against one of the individuals responsible for defrauding Cornelius; (3) $1,365 to Wagner, the professional fiduciary, for services rendered and costs advanced in assisting McDonald in managing the conservatorship; (4) $4,733.73 to McDonald as reimbursement for costs advanced and travel expenses

(McDonald did not request compensation for her services); and (5) $825 to Fox & Associates, which provided nurse case management and caregiver services to Cornelius. Cornelius appealed the order awarding fees and costs on March 17, 2011.

## II. DISCUSSION

Appellant Cornelius acknowledges that Probate Code sections 2641 and 2642 expressly authorize payments to a conservator and the conservator's attorneys from the conservatee's estate but argues that these provisions "empower a court to award compensation to a temporary conservator and his/her attorneys only if and after someone has been appointed permanent conservator of the estate and/or person." Cornelius insists that no compensation is authorized unless the petitioner succeeds in having a permanent conservator appointed. Cornelius also argues that, even if a temporary conservator may recover costs and legal fees, the amount awarded here was excessive and thus an abuse of the court's discretion. We reject the claims, for reasons we now explain.

█ Probate Code section 2641, subdivision (a) provides that a "conservator of the person may petition the court for an order fixing and allowing compensation for services rendered to that time." Similarly, Probate Code section 2642, subdivision (a) provides that "an attorney who has rendered legal services" to the "conservator of the person or estate or both . . . may petition the court for an order fixing and allowing compensation for such services rendered to that time." The statutes make no distinction between temporary and permanent conservators, and we perceive no reason to draw one. A temporary conservator is entitled to reimbursement of legal fees and other expenses properly incurred for the conservatee's benefit during the term of that temporary appointment regardless of whether a permanent conservator is ever appointed.

The situation here is similar to the one in *Estate of Moore* (1968) 258 Cal.App.2d 458, 459–464 [65 Cal.Rptr. 831], where the appellate court held that an unsuccessful petitioner for appointment as guardian of an elderly woman was entitled to his costs and attorney fees. Payment was appropriate because, despite the petitioner's failure to be appointed caretaker, "substantial benefits accrued to Mrs. Moore, viz., court administration of her person and estate during the time she was unable properly to care for herself and her property." (*Id.* at pp. 461–462.)

Appellant Cornelius says *Estate of Moore, supra,* 258 Cal.App.2d 458 is distinguishable because a permanent caretaker was ultimately appointed there (just not the petitioner) while none was appointed here. The distinction does

not hold. The deciding factor in awarding reimbursement in a conservatorship proceeding is not whether a permanent conservatorship is established but whether expenses were incurred in good faith and in the best interests of the proposed conservatee. (*Conservatorship of Lefkowitz* (1996) 50 Cal.App.4th 1310, 1315 [58 Cal.Rptr.2d 299].)

■ "The relationship between a conservator and a conservatee is a fiduciary relationship, like that between a trustee and a beneficiary." (*Conservatorship of Lefkowitz, supra,* 50 Cal.App.4th at p. 1313.) "[A]s a fiduciary, a conservator is bound to act with reasonable prudence and pursuant to a good-faith belief that its actions will tend to accomplish the purpose of its trust by benefitting the conservatee." (*Id.* at p. 1314.) A conservator is thus entitled to compensation for expenses that the conservator believed were necessary to benefit the conservatee and that belief was objectively reasonable. (*Ibid.*)

These findings are readily made where a petitioner succeeds in establishing a permanent conservatorship because the court has adjudicated that a caretaker is necessary and beneficial to the conservatee. In contrast, a court's denial of a petition for permanent conservatorship suggests that a caretaker was not needed, and the effort to establish a conservatorship unnecessary. (*Estate of Moore, supra,* 258 Cal.App.2d at p. 461.) But it does not follow that the absence of a permanent conservatorship (whether by court denial or party dismissal) proves that the petition for a permanent conservatorship and the interim temporary conservatorship were not necessary and beneficial to the conservatee. The petition to appoint a permanent conservator, and appointment of a temporary conservator pending resolution of that petition, may well benefit the conservatee even if a permanent conservatorship is never established. It is benefit to the conservatee, not establishment of a permanent conservatorship, that a court must look to in deciding whether a temporary conservator is entitled to reimbursement.

The Probate Code supports this point. As noted above, Probate Code section 2641, subdivision (a) provides—without distinction between temporary and permanent conservators—that a "conservator of the person may petition the court for an order fixing and allowing compensation for services rendered to that time." Subdivision (c) of that statute further provides that the "conservator shall not be compensated from the estate for any costs or fees that the . . . conservator incurred in unsuccessfully opposing a petition, or other request or action, made by or on behalf of the . . . conservatee, unless the court determines that the opposition was made in good faith, based on the best interests of the . . . conservatee." The relevant question is whether temporary

conservator McDonald acted in good faith, based on the best interest of her father, conservatee Cornelius, in petitioning for conservatorship and in opposing his request to dissolve it.

The trial court expressly found that "[a]ll services and expenses for which compensation is ordered were rendered in good faith and in the best interests of the conservatee." That finding is supported by substantial evidence. As summarized earlier, the petition for temporary conservatorship was supported by declarations from several family members attesting to Cornelius's compromised physical and mental states and susceptibility to fraud. The petition was also supported by a capacity declaration prepared by Cornelius's treating physician, who stated concerns about Cornelius's judgment. These attestations were examined by a neutral court investigator who concluded that Cornelius "is urgently in need of medical and medication supervision and proper nutrition, and is at high risk of undue influence from what appear to be virtual strangers that he has allowed to live in his home." The investigator recommended a temporary conservatorship of Cornelius with McDonald as conservator. It was an independent investigation, not "insinuations and innuendo" as Cornelius claims, that guided the court's determination that a temporary conservatorship was in Cornelius's best interest.

Subsequent reports from the court-appointed investigator and a court-appointed attorney confirm that the temporary conservatorship was established in good faith and for the benefit of conservatee Cornelius. In August 2010, several weeks after the temporary conservatorship was established, the investigator conducted more extensive interviews and reported that Cornelius "has memory deficits, and is exhibiting impaired judgment" and recommended that the temporary conservatorship remain in effect. In September 2010, court-appointed Attorney Simi filed an extensive report with the court after conducting more than two dozen interviews, including interviews of Cornelius, his family members, attorneys, physicians, and neighbors. The attorney dismissed Cornelius's claim that the events giving rise to the conservatorship were isolated and that a conservatorship was not necessary. Attorney Simi cited medical reports showing that Cornelius has "significant impairment of many skills and [mental] functions." Attorney Simi attributed improvements to Cornelius's living conditions to the temporary conservatorship. Attorney Simi noted: "[i]mprovements to Mr. Cornelius's situation have been made largely as a result of arrangements made by the temporary conservator for help with taking medications; monitoring his health; ridding his home of various people who were abusing him physically, mentally, and financially; and having a group of responsible individuals who make their presence known with many of his friends and associates."

■   There is substantial, indeed overwhelming, evidence that conservatee Cornelius was benefitted by the temporary conservatorship. Cornelius's characterization of his daughter and others who came to his aid as an "assemblage of busy-bodies" chasing his money is not borne out by the record. It is a sad feature of conservatorship proceedings that conservatees are sometimes unable to comprehend the good intentions and deeds of others. As a previous court observed, "[t]he individual who first suggests the need for a caretaker, like a lightning rod, often attracts to his [or her] person the lasting wrath and suspicion of the supposed incompetent . . . ." (*Estate of Moore, supra,* 258 Cal.App.2d at p. 461.) So it appears here. Despite Cornelius's criticism, the evidence supports the trial court's finding that the temporary conservatorship was established in good faith and in the best interests of the conservatee.

The evidence also supports the court's finding that all "services and expenses for which compensation [was] ordered were rendered in good faith and in the best interests of the conservatee." Appellant Cornelius disputes this point, "particularly as regards the restraining orders and the attempt to disqualify Appellant's Attorney of choice." The referenced restraining orders are elder abuse protection orders obtained against individuals operating an illegal marijuana farm on Cornelius's property. Cornelius says these individuals were "trusted friends" who provided "casual help" that fostered a "relatively quiet and benign existence" until his daughter and others intruded upon his tranquility. There is substantial evidence to the contrary. The court-appointed investigator concluded that Cornelius had been "taken advantage of emotionally and financially" by these individuals, and Cornelius's sister told the investigator that she believed Cornelius's life was in danger from them. Neighbors expressed concern about "the criminal element" in his household, and reported "late-night arguments," drunkenness, and gunshots fired. A court-appointed attorney reported that "[t]he Sheriff was called out to the property for incidents involving several of these friends on at least 12 occasions in the last year, including eradication of more than 100 marijuana plants in July . . . 2010." The court did not abuse its discretion in finding that legal services performed in obtaining restraining orders against these false friends benefitted Cornelius.

Expenses incurred seeking disqualification of Cornelius's private attorney were also properly awarded. There was a legitimate dispute as to Cornelius's capacity to contract for legal services. Court-appointed Attorney Simi raised serious concerns about Cornelius's capacity and recommended that the court determine that "the purported contract entered into with [private] attorney Philip Gunning for legal services is void." Under these circumstances, the trial court did not abuse its discretion in finding that attorney disqualification expenses were properly incurred. We have reviewed appellant Cornelius's other complaints with the amount of fees and expenses awarded and likewise discern no abuse of discretion. The award, and its amount, were proper.

## III.  DISPOSITION

The order is affirmed.

Ruvolo, P. J., and Rivera, J., concurred.